Edwin **GOLDENBERG** and Harvey J. **Gushner,** individually and on behalf of all others similarly situated, Plaintiffs

v.

**MARRIOTT PLP CORPORATION, Host Marriott PLP Corporation, and Marriott, International, Inc., Defendants**

No. CIV. PJM 95–3461.

United States District Court, D. Maryland.

Oct. 22, 1998.

Frederick Charles Leiner, John B. Isbister, William W. Carrier, III, Tydings & Rosenberg, Baltimore, MD, Joseph C. Kohn, George W. Croner, Kohn, Swift & Graf, Philadelphia, PA, for Plaintiffs.

Jacqueline R. Depew, Frederick Robinson, Fulbright & Jaworski, Washington, DC, Debbie Crupain Darlow, Fulbright & Jaworski, Tom Alan Cunningham, Cunningham, Darlow, Zook & Chapoton, Houston, TX, Roger W. Titus, John Henry Lewin, Jr., Venable, Baetjer & Howard, Baltimore, MD, David G. Lane, McLean, VA, for Defendants.

*OPINION*

MESSITTE, District Judge.

### I. Introduction

On August 5, 1997, the Court approved the settlement of this class action suit and awarded attorney's fees and expenses to Class Counsel—the law firms of Kohn, Swift, & Graf, P.C. and Tydings and Rosenberg, LLP. Through their Unopposed Motion Concerning Distribution of the Settlement Fund, Class Counsel now request that a portion of the interest accrued on the Settlement Fund be used to further compensate Class Counsel as well as the accounting firm of Gazer, Kohn, Maher & Co. for fees and expenses incurred during the administration and distribution of the Settlement Fund. Class Counsel propose that the balance of the

funds be distributed to the class members. Having considered Class Counsel's Motion and the memoranda filed in support of it, the Court will GRANT the Motion in part and DENY it in part.

## II. Background

In 1984, a group of individuals formed the Chesapeake Hotel Limited Partnership ("CHLP") to acquire nine hotels from Marriott Corporation at a cost of $305 million, to be financed in part by a $168 million of purchase money mortgage debt in favor of a Marriott financing subsidiary.[1] Pursuant to a Private Placement Memorandum advising prospective investors of the potential success of the venture ("PPM"), 440 CHLP limited partnership units were sold at $100,000 per unit, $50,000 per half unit. Marriott PLP Corporation ("Marriott PLP"), a wholly-owned subsidiary of Marriott Corporation, the designated general partner of the Partnership, entered into agreements with other Marriott subsidiaries and/or affiliates to provide management services and furniture, fixtures and equipment ("FF & E") to the Partnership's hotels.

The Partnership did not fare as well as predicted. Two hotels (in Tulsa and Charlotte) were lost to foreclosure, no cash was ever distributed to the limited partners, and the Partnership's 1996 Annual Report indicated that the Partnership carried over $240 million in debt along with accrued but unpaid management fees totaling more than $144 million.

On November 14, 1995, a proposed class action was filed in this Court against Defendants, alleging, *inter alia*, that: (a) Marriott PLP had breached fiduciary duties owed to the CHLP limited partners; (b) Marriott PLP had breached the CHLP Certificate and Agreement of Limited Partnership ("Partnership Agreement"); (c) all Defendants had defrauded the CHLP limited partners; and (d) all Defendants had made negligent misrepresentations about the CHLP. Defendants answered, denying the allegations and counterclaimed for a declaratory judgment that they had neither violated federal securities laws nor breached their contractual and fiduciary duties to the CHLP limited partners.[2] On January 9, 1997, the action was certified as a class action.

Meanwhile, a minority of CHLP limited partners who opted out of the class had begun a separate, non-class action against Defendants in Texas state court. Unlike the Maryland class action, which operated via a contingency agreement in which class counsel advanced costs to fund the litigation in exchange for a share in any proceeds, costs in the Texas litigation were funded by contributions of individual litigants.

The differences did not end there. Discovery in the Texas litigation was more extensive. Among other things, limited partners in the Texas litigation were required to produce individual income tax returns dating as far back as 15 years, to respond to interrogatories and document requests, and to give oral depositions. In contrast, with the exception of the Class Representatives, Class Members were never deposed in the Maryland litigation and never required to produce more than a minimum number of documents received from Marriott pursuant to the original investment.

Both cases settled on June 5, 1997. According to the terms of the proposed settlement in the Maryland litigation, Defendants agreed to pay a total of $22.35 million (the "Settlement Fund") in the form of $75,000 for each CHLP unit, $37,500 for each CHLP half-unit, and a reduced *pro rata* amount for any other fractional unit transferred pursuant to the terms of the settlement. The settlement contemplated that, in return for this payment, each class member would assign, transfer and convey his, her or its CHLP unit (or half unit or other fractional unit) to Host Marriott or its designee (other than Defendant Marriott PLP).[3] The settle-

---

1. In October, 1993, Marriott Corporation was dissolved and the relevant parts of its business affecting CHLP devolved to two newly created entities, Host Marriott Corporation and Marriott International Inc.

2. Soon after, the Court granted Plaintiffs' Motion to Dismiss Defendants' counterclaims.

3. As a condition precedent to the effectuation of the settlement, a majority of CHLP limited partners required to agree to certain amendments of the CHLP Partnership Agreement which, *inter*

ment also provided that each CHLP partner would release any and all claims against Defendants arising from or connected with the purchase of their CHLP units and/or the operation and management of the CHLP. The terms of the release were summarized in the Notice and set forth in full in the Proof of Claim provided to each class member. A fairness hearing was set for August 5, 1997.

### III. Original Request for Counsel Fees

In a bench ruling issued on August 5, 1997, the Court, after applying the factors set forth in *In re: Jiffy Lube Securities Litig.*, 927 F.2d 155 (4th Cir.1991), found the settlement to be fair and reasonable. The Court does not propose to restate its reasons for approving the settlement at this time. However, in light of recent events, it has become appropriate to discuss more fully the Court's rationale for granting the original request for counsel fees, a decision also made from the bench on August 5, 1997.

### A.

In conjunction with settlement of the case, Class Counsel requested $2.55 million in fees and $393,297.76 in costs and litigation expenses. In reviewing this request, the Court was required to consider whether the request was "reasonable." *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980).

The Court noted that courts reviewing such requests have generally followed one of two approaches: (1) the "lodestar" method, which involves multiplying the number of hours that the attorney expended by the attorney's normal hourly rate to create a "lodestar" figure, which may be adjusted upwards or downwards by the court to account for the contingent nature of the case, the quality of work performed, delay in payment,

and other factors; and (2) the "percentage" method, which involves determining, based on similar factors, whether the amount requested represents a fair percentage of the recovery which may be awarded as attorneys' fees. *See Report of the Third Circuit Task Force, "Court Awarded Attorneys' Fees,"* 108 F.R.D. 237 (1985)(the *"Task Force Report"*).

The Court further noted that courts have become increasingly critical of the lodestar method, which requires scrutiny of Class Counsel's billing practices—a time consuming process—whereas the percentage method is more akin to the common litigation practice of setting contingency fees based on a percentage of the recovery. Thus, for example, in *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C.Cir.1993), the court adopted the percentage method, stating that "a percentage-of-the-fund approach more accurately reflects the economics of litigation practice," and is "less demanding of scarce judicial resources" since "[i]t is much easier to calculate a percentage-of-the-fund fee than to review hourly billing practices over a long, complex litigation." *See also, Manual of Complex Litig., Third* § 24.121 ("In practice, the lodestar method proved difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result."). In all, eight Circuits (the Third, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and District of Columbia) have adopted the percentage method. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 821–22 (3d Cir.), *cert. denied*, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995); *Longden v. Sunderman*, 979 F.2d 1095, 1099 (5th Cir. 1992); *Rawlings v. Prudential–Bache Properties*, 9 F.3d 513, 517 (6th Cir.1993); *In Matter of Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992); *Six Mexican*

---

*alia,* would permit Marriott PLP and its affiliates full voting rights with respect to all partnership units held by Marriott PLP or acquired by its affiliates; establish special voting rules that would apply if Marriott PLP & its affiliates owned less than 90% of the outstanding units which limited Marriott PLP's voting rights on transactions in which Marriott PLP or its affiliates had an economic interest other than as a unitholder or general partner; amend the definition of "Affiliate" so that publicly-entities would

not be deemed an affiliate of Marriott PLP or any other affiliate unless a person or group of persons owned, directly or indirectly, twenty percent (20%) or more of the outstanding stock of Marriott PLP or an affiliate and the other entity; eliminate the provision that prohibits transfer of 50% or more of the outstanding units within a 12–month period; and eliminate the provision that permitted unit transfers only on the first day of a fiscal quarter.

*Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 456 (10th Cir.), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Camden I Condominium Ass'n. v. Dunkle,* 946 F.2d 768 (11th Cir.1991); *Swedish Hospital Corp.,* 1 F.3d at 1271. Moreover, the Supreme Court has implicitly approved the percentage method. In a case involving calculation of attorney fees under a statutory lodestar provision, the Court differentiated common fund cases, "where a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

In approving the original fee request, the Court observed that the Fourth Circuit has not decided which of the two general approaches to adopt. *But see Daly v. Hill,* 790 F.2d 1071 (4th Cir.1986)(involving fee-shifting statute rather than common fund). A few recent decisions within this Circuit, however, have endorsed the percentage method. Thus in *Strang v. JHM Mortgage Sec. Ltd. Partnership,* 890 F.Supp. 499, 502 (E.D.Va. 1995), the Virginia Federal Court held that although the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases. In adopting the percentage method, the *Strang* court noted that "the percentage method is more efficient and less burdensome than the traditional lodestar method, and offers a more reasonable measure of compensation for common fund cases." *Id.* at 503. On the basis of this authority, the Court in the present case found the percentage method simpler, more efficient, and more accurate in terms of approximating a "fair" award. *Accord, Ed-*

*monds v. U.S.,* 658 F.Supp. 1126 (D.S.C. 1987).

### B.

At the August 5, 1997 hearing, the Court observed, in connection with the original fee request, that courts employing the percentage method have yet to articulate a common set of factors to be used in determining a "reasonable" fee. The Ninth Circuit, for example, has established a 25% benchmark for such awards, subject to upward or downward adjustment "to account for any unusual circumstances involved in this case." *Paul, Johnson,* 886 F.2d at 272. The Tenth Circuit has endorsed the use of a sixteen factor test, drawn partly from a statutory fee-shifting case, *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), *abrogated in part on other grounds; Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).[4] The *Manual of Complex Litig., Third,* § 24.121 lists seven factors commonly considered: (1) the size of the fund and the number of persons benefitted; (2) the presence or absence of substantial objections by class members to the settlement terms and/or the fee request; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards in similar cases. Some courts have employed a "sliding scale" for unusually large recoveries in order to avoid a potential windfall for counsel. *See, for example, In re First Fidelity Bancorporation Sec. Litig.,* 750 F.Supp. 160 (D.N.J. 1990) (30% of first $10 million, 20% of next $10 million, 10% of any recovery greater than $20 million).[5]

---

**4.** Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; (12)

awards in similar cases; (13) the time required to reach a settlement; (14) whether there are substantial objections to the settlement terms or the fee request; (15) non-monetary benefits conferred upon the class by settlement; and (16) the economics involved in prosecuting a class action.

**5.** *Compare* Local Rule 109.2.b of the Rules of the U.S. District Court of Maryland pertaining to attorneys fees in civil rights and discrimination cases.

In the instant case, the Court concluded that the case was fairly complex, requiring analysis of several complicated financing arrangements and tax shelter opportunities in the context of a business and regulatory climate in flux. Defendants were represented by able and experienced counsel from large national law firms based in Houston and Baltimore, who vigorously defended the lawsuit. The settlement was concluded only after intensely adversarial litigation, including merits and expert discovery and arm's-length negotiations spanning several months and consuming a great deal of Class Counsel's time and effort. Moreover, Class Counsel advanced nearly $400,000 in costs and litigation expenses with no guarantee that those costs would ever be reimbursed. Finally, the settlement reached was considerable, representing 45% of the damages potentially recoverable. For this reason, the settlement was quickly endorsed by all but a few members of the Class.

With those considerations in mind, the Court concluded that the 11.3% requested by Class Counsel (as well as all costs) seemed eminently reasonable—especially in comparison to the fees in similar cases. Thus, using the percentage method, the Court found Class Counsel's request fair and reasonable and approved it.[6]

### IV. Supplemental Request for Counsel Fees

■ As part of the final accounting for the Settlement Fund, Class Counsel have filed an Unopposed Motion Concerning Distribution of the Settlement Fund, in which counsel report that all class members have received and negotiated checks representing the full payment required by the Settlement Agreement. Class Counsel also report that the Fund earned a total of $226,758.09 in interest income through June 30, 1998, and that the balance in the Fund as of that date was $146,855.07.[7] Class Counsel propose to use roughly 54% of the remaining balance of the Fund to pay fees, costs, and expenses related to the administration and distribution of the Fund.

Attorneys for KS & G request $68,215 as compensation for 237.2 hours of work, while T & R requests $105 for 0.9 hours of work. KS & G seeks $1853.12 to reimburse expenditures for travel, long distance phone calls, photocopying, and postage. T & R requests $217 to cover the costs of a search on LEXIS–NEXIS.

A fee in the amount of $9700 is also sought for the accounting firm of Gazer, Kohn, Maher, & Co. ("GKM"), retained by Class Counsel to assist with the distribution of the Fund and prepare the applicable Federal income tax returns required of the Fund. The specific tasks assigned to GKM included: preparing and revising the final class distribution list; issuing and mailing checks to class members; reconciling the distribution bank account statements; pursuing proper distribution of outstanding checks; responding to inquiries from class members; advising Class Counsel regarding estimated tax payments required of the Fund; and preparing the 1997 and 1998 tax returns. GKM is also to administer any additional distribution of funds approved by the Court.

Class Counsel justify their own request for further fees based on having spent a substantial amount of time on the following tasks: coordinating with GKM on distribution and tax matters; obtaining and providing the underlying information used in the Fund distribution; managing the investment and handling of the Fund; and communicating extensively with class members and their representatives regarding the settlement, the Fund distribution, and related tax ramifica-

---

6. The Court noted that even under a lodestar approach, the fee award was reasonable. The cumulative lodestar figure through July 25, 1997 was $712,348. Thus, the $2.55 million fee requested amounted to a lodestar enhancement of 3.6—well within the average range of 3–4.5 for comparable cases. *See, e.g., Rabin v. Concord Assets Group, Inc.*, [1991–1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 96, 471 at 92, 081 (S.D.N.Y.) (Approving multiple of 4.4 and noting "in recent years multipliers of between 3 and 4.5 have been common"); *Behrens v. Wometco Enter., Inc.*, 118 F.R.D. 534, 549 (S.D.Fla.1988) *aff'd* 899 F.2d 21 (11th Cir.1990) ("lodestar multiples in large and complicated class actions ranges from a low of 2.26 to a high of 4.5").

7. The Court assumes that the accrued interest to date has increased since June 30, 1998, the date that Class Counsel reported it to be $226,758.09.

tions. In particular, Class Counsel assert that the settlement terms implicated complex tax issues, requiring attorneys from KS & G to devote considerable time and effort to advising class members on their individual tax circumstances. Class Counsel claim, therefore, that the work involved in administering and distributing the Fund in this case was significantly more complex than that customarily required to implement a settlement.

After deduction of the requested fees and costs, Class Counsel would have the Court approve distribution to the Class of the balance of the Fund. Assuming that the Court authorizes payment of the fees, expenses, and costs listed above, approximately $95,000 would be available for distribution to the class on a *pro rata* basis. This total includes a $29,000 tax refund anticipated for the Fund based on an analysis of 1997 and 1998 federal tax returns.

## V. Discussion

 Pursuant to both the Final Judgment Order approving settlement of this case as well as the Stipulation of Settlement distributed to class members, the Court retained jurisdiction over all matters relating to the implementation, enforcement and performance of the Stipulation, including distribution of the Fund. Accordingly, the Court has a continuing duty to act as a fiduciary to the members of the class, a guardian of their interests in the settlement. *See Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1306 (4th Cir.1978)(citing "special responsibility" of District Court as guardian of rights of class members); *Weinberger v. Kendrick*, 698 F.2d 61, 69 n. 10 (2d Cir.1982); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 225 (5th Cir.1981). Particularly with regard to the awarding of attorney's fees, courts have noted that "special problems exist ... in a class action suit since class members with low individual stakes in the outcome often do not file objections, and the defendant who contributed to the fund will usually have no interest in how the fund is divided between the plaintiffs and class counsel." *Swedish Hosp. Corp.*, 1 F.3d at 1265; *see also, In re*

*General Motors Corp.*, 55 F.3d at 819 (citing the need for "thorough judicial review" of fee applications to "ensure ... that counsel and class members alike are treated fairly"). The vigilance of the Court is not diminished, therefore, merely by the lack of opposition to the fee application by the Defendants. The Court must engage in an independent evaluation of the supplemental motion, taking into account the best interests of the class as well as fairness to Class Counsel.[8]

As an initial matter, it is reasonable to inquire whether any supplemental award of attorney's fees for work performed in the administration and distribution of the settlement is justified. To the extent that the initial fee award was based on a contingency fee theory, it may be argued that Class Counsel's original fee should also cover compensation for post-judgment services including administration and distribution of the Fund. Judge Louis Oberdorfer of the U.S. District Court for the District of Columbia raised the issue in *Pray v. Lockheed Aircraft Corp.*, a class action which also involved a supplemental application for attorney's fees:

> "There is a substantial argument that plaintiffs' counsel have already been compensated for any incidental work which they have performed in implementing the settlement and distributing the proceeds. In a class action where the attorneys are paid on a contingent fee basis, for example, no extra compensation is usually provided for any work necessary to distribute the funds to the plaintiffs... It might therefore have been anticipated that trial counsel would aid the Court in resolving the final details of the settlement without the expectation of further compensation."

1987 WL 9757 at *1 (D.D.C.1987). Indeed, one of the "principal grounds" cited by Class Counsel in support of their initial fee petition was that "applicants' work on the case continues," and that they planned to "present the settlement to the Court for final approval, process the class members' Claim Forms, respond to inquiries from class members, and distribute the Settlement Fund to the class

8. *See generally Class Action Lawsuits; Examining Victim Compensation and Attorneys' Fees; Hearing Before the Subcomm. on Admin. Oversight* *and the Courts of the Senate Committee on the Judiciary,* 105th Cong., 1st Sess. (1997).

members in accordance with the Plan of Allocation." Joint Application of Class Counsel for an Award of Attorney's Fees at 7. Yet despite affirming that further legal services would be necessary, the fee petition is devoid of any mention of the possibility that Class Counsel might seek further compensation for those services. It would not be unreasonable, therefore, for a class member or the Court to have concluded that the initial fee award was intended to constitute the total compensation to be awarded to Class Counsel.

■ Assuming *arguendo*, however, that some compensation for the post-judgment services is appropriate, there remains the problem of notice to the class. Notice of the potential extent of attorneys fee awards is deemed essential because it allows class members to determine the possible influence of the fees on the settlement and to make informed decisions about their right to challenge the fee award. *See In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1130 (7th Cir.1979); *General Motors Corp. v. Bloyed*, 916 S.W.2d 949, 958 (Tex.1996). Some courts, in fact, have invalidated class action settlements because of class counsel's failure to notify the class members of the potential extent of their fee award. *See, e.g., In re General Motors Corp.*, 594 F.2d at 1130; *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir.1980).

Moreover, notification of class counsel's intent to seek additional compensation for post-judgment services in class action lawsuits is neither unusual nor especially difficult to accomplish. In some cases, class counsel have included in their initial fee petition a request for the exact amount required to cover any fees, costs, or expenses to be incurred in the administration and distribution of the settlement. *See, e.g., Spicer v. Chicago Bd. Options Exch.*, 844 F.Supp. 1226 (N.D.Ill.1993); *Mun. Auth. of the Town of Bloomsburg v. Pennsylvania*, 527 F.Supp. 982, 997 (M.D.Pa.1981); *Roberts, et al. v. Texaco, Inc.*, 979 F.Supp. 185, 191 (S.D.N.Y.

1997). In other cases, class counsel have either reserved the right to seek additional fees in the stipulation of settlement or have requested that a separate fund be set aside to provide for future fees and costs. *See, e.g., Stoller v. Baldwin–United Corp., et al.*, 650 F.Supp. 341, 349 (S.D.Ohio 1986); *In re Montgomery Co. Real Estate Antitrust Litig.*, 83 F.R.D. 305 (D.Md.1979)(class counsel—Tydings & Rosenberg—requested that a supplemental fund be set aside to compensate for settlement administration costs). Class members have frequently been notified of the maximum amount of attorney's fees to be awarded in a settlement. *See, e.g., Pozzi v. Smith, et al.*, 952 F.Supp. 218, 224 (E.D.Pa.1997)(class members notified that attorney's fees would not exceed one-third of the settlement fund); *Mun. Auth. of the Town of Bloomsburg*, 527 F.Supp. at 990 (class members notified that attorney's fees would not exceed $250,000).

The omission of any mention of possible compensation for post-judgment services in the present case is especially curious in light of Class Counsel's extensive experience in handling class action lawsuits. Class Counsel attached to a memorandum in support of their supplemental fee request at least 14 Orders from cases in which Kohn, Swift, & Graf, P.C. (or the firm's predecessors) had served as class counsel in which the court awarded supplemental attorney's fees for the administration and distribution of the settlement fund. Additional fees, costs, and expenses associated with post-judgment administration of the Fund, therefore, could easily have been anticipated. The Court is now faced with an unopposed request for supplemental fees without the benefit of knowing whether class members may have objections to such compensation.

## VI. Conclusion

■ Given the lack of notice to the Class, as well as the reasonably straightforward course of the Fund administration, the Court might well be justified in denying the supplemental fee request altogether.[9]

---

9. The Court distinguishes Class Counsel's request for reimbursement of expenses—KS & G $1853.12, and T & R $217—from their request for fees. It also distinguishes the fees of the accounting firm (GKM) $9700. These items are fairly payable. Even in the absence of formal notice, class members must be presumed to have known that future out-of-pocket expenses would

There are, however, a few countervailing considerations. In the first place, the failure to notify the class of a possible request for future fees was arguably a simple oversight, which could have been avoided by the insertion in the notice of proposed settlement and initial fee petition of a mere sentence or two. Additionally, Class Counsel has apparently never encountered a trial court's resistance to awarding supplemental fees in such cases as this and presumably expected none here.

While the Court is not inclined to award the supplemental fee in full simply because other courts may have done so, the Court is willing to entertain something of a compromise. Thus the Court recognizes that in a few cases, courts have held that attorneys are entitled to interest on a settlement fund in the proportion that the underlying fee award bears to the basic fund. *See, e.g., In re Oracle Sec. Litig.*, 852 F.Supp. 1437, 1458 (N.D.Cal.1994). Here such an award would represent 11.3% of the accrued interest.[10]

While an award in this amount would be less than Class Counsel's request, the Court must also take into account what the cost of notifying the class would be as well as the further attorney time needed to prepare and respond to such notice. Moreover, the Court is unable to commit itself to granting the pending request in full even if notice is sent, particularly if that amount draws an objection. On balance, it seems preferable to bring closure to these proceedings, something which the Court feels this decision will do.

Class Counsel's Unopposed Motion Concerning Distribution of the Settlement Fund will therefore be GRANTED in part and DENIED in part. Expenses of Class Counsel and the fee and expenses of the GKM accounting firm will be approved in full. Supplemental attorneys fees in the amount of 11.3% of the accrued interest on the Settlement Fund to the date of final distribution will be approved. The balance of the fund will be distributed *pro rata* (including ac-

crued interest net after expenses) to the class members.

A separate Order will issue implementing this decision.

### ORDER

Upon consideration of Class Counsel's Unopposed Motion Concerning Distribution of the Settlement Fund, and the record in the above-captioned proceeding, it is, for the reasons set forth in the accompanying Opinion, this 22 day of October, 1998

ORDERED as follows:

1. Said Motion is hereby GRANTED in part and DENIED in part.

2. Distribution of the balance of the Settlement Fund, after deducting the fees and expenses indicated below, is authorized to those class members who previously received settlement distributions in accordance with the Plan of Distribution approved by the Court. Such distributions, including accrued interest on the balance of the Settlement Fund after payment of fees and expenses as further described herein, shall be made to class members *pro rata*, based on their ownership of units in the Chesapeake Hotel Limited Partnership.

3. All claims by class members which may have been brought in this litigation for payment from the Settlement Fund are forever barred.

4. The filing of all applicable Federal income tax returns on behalf of the Settlement Fund and the payment of all taxes due and owing thereon is authorized.

5. Payment of a fee to Gazer, Kohn, Maher & Company in the amount of $9700 is authorized for services rendered in connection with the administration of the Settlement and the distribution of the Settlement Fund in accordance with the Plan of Distribution.

6. Payment of a fee to Kohn, Swift & Graf, P.C. in an amount equal to 11.3% of the interest accrued on the Settlement Fund to

---

be payable before any distribution of the corpus of the fund to class members would be made. Fees of accountants, as opposed to those of attorneys, are considered expenses for this purpose.

10. See Footnote 6, *supra*.

the date of distribution is authorized, for services rendered for the benefit of the Class during the period from September 10, 1997 through the final distribution of the fund. Payment of that portion of this authorized payment which is equal to the amount of any income tax refund applicable to the Settlement Fund shall be deferred until receipt of that refund; provided that the fee to Tydings and Rosenberg LLP, pursuant to Paragraph 7 hereof, shall be payable out of the said 11.3% of the accrued interest.

7. Payment of a fee to Tydings and Rosenberg LLP in the amount of $105.00 is authorized for services rendered for the benefit of the Class during the period from September 10, 1997 through final distribution.

8. Payment to Kohn, Swift & Graf, P.C. in the amount of $1,853.12 is authorized for reimbursement of out-of-pocket costs incurred on behalf of the Class during the period from July 26, 1997 through June 30, 1998.

9. Payment to Tydings and Rosenberg LLP in the amount of $217.00 is authorized for reimbursement of out-of-pocket costs incurred on behalf of the class during the period from July 26, 1997 through June 30, 1998.

10. Class Counsel shall file a final accounting with the Court by no later than 90 days from the date of this Order.