## In re MICROSTRATEGY, INC. SECURITIES LITIGATION

### No. CIV. A. 00–473–A.

United States District Court, E.D. Virginia, Alexandria Division.

July 24, 2001.

---

Craig Crandall Reilly, Richards, McGettigan, Reilly & West, P.C., Alexandria, VA, for Plaintiffs.

Edward John Bennett, Williams & Connolly, Washington, DC, Leo Stephen Fisher, Bean, Kinney & Korman, P.C., Arlington, VA, for Defendants.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

In this federal securities fraud class action, plaintiffs sued (i) MicroStrategy, Inc. ("MicroStrategy"), (ii) certain officers of MicroStrategy ("Individual Defendants"), and (iii) MicroStrategy's auditor, PricewaterhouseCoopers ("PwC").[1] Plaintiffs settled their claims against the MicroStrategy Defendants for a total consideration, payable wholly in notes, common stock, and warrants, of $100–135 million, depending on the market for the securities. That settlement has received Court approval. *See In re MicroStrategy, Inc. Sec. Litig.,* 148 F.Supp.2d 654 (E.D.Va.2001). Plaintiffs have now settled with the remaining defendant, PwC, for a total cash consideration of $55 million. At issue here is whether this settlement should be approved as fair and adequate and as meeting the requirements of Rule 23, Fed. R.Civ.P., and due process.

### I.

No extended discussion of the allegations of the consolidated complaint or of the procedural history of the case is necessary here, for they have been fully discussed in two prior Memorandum Opinions. *See In re MicroStrategy, Inc.,* 148 F.Supp.2d 654 (approving plaintiffs' settlement with the MicroStrategy Defendants); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620 (E.D.Va.2000) (denying motions to dismiss). In summary, this is a federal securities class action brought

---

1. Defendants in categories (i) and (ii) are collectively referred to as the "MicroStrategy Defendants."

against the MicroStrategy Defendants and PwC on behalf of all persons who purchased MicroStrategy common stock or call options or sold MicroStrategy put options (collectively, "MicroStrategy securities") during the period June 11, 1998 through March 20, 2000 (the "class period"),[2] asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and under Rule 10b–5 promulgated pursuant to the Exchange Act.[3] This action is also brought on behalf of a subclass of persons who purchased MicroStrategy stock contemporaneously with the sales of MicroStrategy stock by any of the Individual Defendants and who assert claims under Section 20A of the Exchange Act.[4]

■ PwC (or its predecessor Coopers & Lybrand LLP) was MicroStrategy's outside accountant and auditor during the years 1997, 1998, 1999, and 2000. In this regard, PwC, among other services provided to MicroStrategy, issued reports that were included in MicroStrategy's filings with the Securities and Exchange Commission ("SEC"), in which reports PwC represented that it had examined MicroStrategy's financial statements for the years ended December 31, 1997, 1998, and 1999 in accordance with Generally Accepted Auditing Standards ("GAAS") and that those financial statements were presented in conformity with Generally Accepted Accounting Principles ("GAAP").[5] In addition, plaintiffs alleged that PwC was actively involved in the preparation of MicroStrategy's publicly reported quarterly financial results.

This action arose out of MicroStrategy's March 20, 2000 announcement that its 1998 and 1999 financial statements had to be restated to correct previously reported earnings as significant losses.[6] Plaintiffs alleged that, over a period of two years,

2. Excluded from the class are defendants, any person, firm, trust, corporation, or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, the partners, principals, officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns of defendants, and the immediate family members of any such individual. *See In re MicroStrategy Sec. Litig.*, No. 00–473–A (E.D.Va. Aug. 25, 2000) (amended Order regarding class certification).

3. 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5. By Order dated August 10, 2000, as amended on August 25, 2000, this class was conditionally certified, and Akiko and Atsukini Minami, Local 144 Pension Fund, Vera Schwartz, and Paul Schweitzer were appointed class representatives. *See In re MicroStrategy Inc. Sec. Litig.*, No. 00–473–A (E.D.Va. Aug. 10, 2000) (Order regarding class certification); *In re MicroStrategy, Inc. Sec. Litig.*, No. 00–473–A (E.D.Va. Aug. 25, 2000) (amended Order regarding class certification).

4. 15 U.S.C. § 78t–1. The August 10 and 15 orders also conditionally certified this subclass and appointed Vera Schwartz subclass representative. *See In re MicroStrategy Inc. Sec. Litig.*, No. 00–473–A (E.D.Va. Aug. 10, 2000) (Order regarding class certification); *In re MicroStrategy Inc. Sec. Litig.*, No. 00–473–A (E.D.Va. Aug. 25, 2000) (amended Order regarding class certification). As the certified subclass does not assert a Section 20A claim against PwC, it has no relevance with respect to the settlement in issue.

5. Generally Accepted Accounting Principles "are the conventions, rules, and procedures that define accepted accounting practices." *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

6. Plaintiffs alleged that by the market's close on Monday, March 20, 2000, the price of MicroStrategy stock fell precipitately, from $266.75 per share at closing on Friday, March 17, 2000, to $86.75 per share, as a result of the disclosure.

the MicroStrategy Defendants repeatedly published materially false financial statements relating to MicroStrategy's financial condition. PwC, in turn, issued "clean" unqualified audit opinions stating that the financial statements were in compliance with GAAP and allegedly participated in the preparation of MicroStrategy's quarterly reports, which allegedly contained misrepresentations and omissions about the company's financial condition. These statements allegedly transformed millions of dollars of losses into reported profits, caused the price of MicroStrategy common stock and options to be inflated and/or distorted significantly during the class period, and therefore damaged plaintiffs. Plaintiffs also alleged that, at the same time it was acting as MicroStrategy's auditor, PwC was also reaping substantial financial rewards as a reseller and systems integrator of MicroStrategy products. This business relationship, plaintiffs alleged, violated PwC's obligation under GAAS to maintain its independence from its audit client.

On July 17, 2000, the MicroStrategy Defendants and PwC filed their respective motions to dismiss under Rule 12(b)(6), Fed.R.Civ.P. On September 15, 2000, these motions were denied, except for defendant Ingari's motion to dismiss plaintiffs' claim under Section 20A of the Exchange Act. *See In re MicroStrategy*, 115 F.Supp.2d at 664–65. Plaintiffs thereafter launched an intensive, multi-pronged discovery program that involved the acquisition of documentary and testimonial evidence from PwC, the MicroStrategy Defendants,[7] and various nonparties. Discovery entailed, for example, two requests for production of documents directed to PwC, one request for production of documents directed to the MicroStrategy Defendants, and forty-two subpoenas *duces tecum* directed to nonparties. These initiatives ultimately yielded approximately 450,000 pages of documents. In addition, plaintiffs engaged in a comprehensive and wide-ranging deposition program that proved critical to the development of plaintiffs' case,[8] and served four sets of interrogatories upon PwC. On numerous occasions, plaintiffs' discovery efforts were met with resistance from PwC and necessitated judicial involvement in resolving the parties' disputes.[9] Plaintiffs, in turn, were required to

---

**7.** As part of the partial settlement reached between plaintiffs and the MicroStrategy Defendants, the MicroStrategy Defendants agreed not to interfere with plaintiffs' efforts to obtain production of necessary information from PwC, which continued as the company's outside auditor, and to refrain from asserting any right to a discovery stay had PwC sought reconsideration of the denial of PwC's threshold dismissal motion or sought to take an interlocutory appeal. In addition, the MicroStrategy Defendants also agreed to confidential interviews, to which PwC was not granted access, to aid plaintiffs in their discovery efforts against PwC.

**8.** Deposed were (i) present and former PwC partners and employees who were either involved in the audits of the original MicroStrategy financial statements, the restatements, or matters relating to PwC's role as a reseller and/or systems integrator of MicroStrategy products; (ii) senior officers and directors of MicroStrategy; (iii) MicroStrategy customers; (iv) the lead underwriter of the company's proposed securities offering; and (v) PwC's designated accounting/auditing and damages experts. Plaintiffs also conducted interviews of numerous present and former employees of MicroStrategy as well as others with potentially relevant information.

**9.** For instance, PwC refused to produce documents concerning restatements involving other PwC clients and moved for a protective order to preclude plaintiffs from obtaining these documents and to block relevant third-party subpoenas. The magistrate judge denied PwC's motion as to the third-party subpoenas, and PwC ultimately agreed to produce virtually all of the documents at issue. *See In re MicroStrategy, Inc. Sec. Litig.*, Civ. A. No. 00–473–A (E.D.Va. Jan. 12, 2001) (Or-

respond to discovery propounded by PwC, including document requests, interrogatories, and depositions. Finally, plaintiffs conducted extensive expert discovery, retaining damages and accounting/auditing experts who prepared reports and were deposed by PwC, and deposing PwC's three designated experts.

On March 6, 2001, PwC filed a motion for partial summary judgment seeking to narrow the class to only those persons who engaged in transactions involving MicroStrategy securities for the period of March 6, 2000 through March 20, 2000, the end of the class period. In this regard, PwC argued that (i) under the PSLRA's damage cap, no person who purchased MicroStrategy stock prior to October 29, 1999 suffered cognizable damages; and (ii) PwC made no statement concerning MicroStrategy's quarterly earnings or other reports during the remainder of the class period for which it could be held liable until March 6, 2000, when it issued a clean audit opinion with respect to the company's year-end December 31, 1999 financial statements. Plaintiffs opposed PwC's motion and filed their own cross-motion for partial summary judgment on March 26, 2001 seeking a finding, as a matter of law, (i) that the MicroStrategy financial statements and PwC's opinions thereon were material; (ii) that those financial statements and PwC's opinions thereon admittedly were false and misleading when issued to the public; and (iii) that those statements were made in connection with the purchase or sale of MicroStrategy securities. PwC, in turn, opposed plaintiffs' cross-motion. Oral argument on all motions was heard on April 20, 2001, and the

matter was taken under advisement. *See In re MicroStrategy, Inc. Sec. Litig.*, No. 00–473 (E.D.Va. Apr. 20, 2001) (Order).

In late April 2001, PwC filed a motion to decertify the class that had been conditionally certified by Order dated August 25, 2000. *See In re MicroStrategy, Inc. Sec. Litig.*, No. 00–473 (E.D.Va. Aug. 25, 2000) (amended Order regarding class certification). PwC argued that the previously conditionally certified class did not satisfy Rule 23's commonality, typicality, or adequacy requirements with respect to the elements of reliance, materiality, loss causation, and damages. *See* Fed.R.Civ.P. 23. More specifically, PwC argued, *inter alia,* that any presumption of reliance was rebutted by the fact that MicroStrategy securities traded in inefficient markets during significant portions of the class period.

On or about April 27, 2001, before plaintiffs' response to PwC's motion to decertify the class was due, PwC and plaintiffs reached an agreement in principle to settle and release plaintiffs' claims against PwC in exchange for consideration of $51 million in cash, plus interest accruing at a rate of 7% starting as of September 15, 2000, the date on which PwC's motion to dismiss was denied, for a total of $55 million in cash as of October 29, 2001. By the time the parties reached this agreement, the parties had completed extensive work to prepare for trial, which was scheduled to begin on June 5, 2001, and to comply with a pretrial schedule imposed by Order dated April 9, 2001. In this regard, plaintiffs and PwC had filed their respective trial witness lists, exhibit lists,[10] and deposition designations, and plaintiffs were well

der). Moreover, of the almost 200,000 pages of documents PwC produced, more than 125,000 pages were produced only after plaintiffs filed motions to compel and thus were the product of plaintiffs' persistence in conducting discovery.

10. Plaintiffs' exhibit list contained approximately 550 document designations, and PwC's list approximately 1,500.

into the process of formulating objections to PwC's designated trial exhibits and preparing motions in limine.[11]

This settlement was the culmination of exhaustive and extensive arm's-length negotiations between plaintiffs' co-lead counsel and PwC that began when these parties initially discussed possible settlement of the action as to PwC in November 2000, shortly after plaintiffs agreed to settle and release their claims against the MicroStrategy Defendants (the "MicroStrategy settlement").[12] At the time, however, the parties held widely disparate views of the litigation, and the discussions ended with the parties at an impasse. The parties did not meet again to discuss a possible settlement until early March 2001. To this end, the parties accepted the Court's suggestion during the course of a pre-trial conference on March 15, 2001 that they meet for a mediation session with another judge in this division, and did so on March 21, 2001. This mediation session did not produce a settlement, although the parties continued to meet to discuss a settlement. These discussions intensified shortly after the

April 20, 2001 summary judgment hearing and resulted in an agreement-in-principle on April 27, 2001. The parties thereafter memorialized their agreement and finalized a stipulation that was signed by the parties on May 21, 2001 ("PwC Settlement").[13] On May 24, 2001, the Court preliminarily approved the proposed settlement and directed the distribution and publication of notice of the settlement to the class.

Pursuant to an Order dated May 25, 2001, plaintiffs caused the distribution of over 69,000 copies of the notice and accompanying proof of claim and the publication of a summary notice. Dissemination of the notice commenced before June 1, 2001 and has now been completed.[14] Accordingly, the task at hand is to determine (i) whether the PwC Settlement should be approved as fair and adequate; (ii) whether the proposed plan of allocation should be approved as fair and adequate; (iii) whether the bar order provided for in the PwC Settlement is appropriate in the circumstances of this case;[15] and (iv) whether

---

**11.** Plaintiffs also had retained trial consultants to advise and assist counsel in managing, through computer and video technology, the presentation of documentary and video-taped-deposition evidence at trial, and had developed databases for use at trial.

**12.** For a thorough discussion of this settlement, see *In re MicroStrategy*, 148 F.Supp.2d 654.

**13.** The stipulation contains a plan of allocation of the net-settlement fund that is identical to the plan of allocation employed in plaintiffs' judicially approved settlement with the MicroStrategy Defendants, except that the instant plan does not provide for any allocation of the funds for members of the certified Subclass, who assert claims under Section 20A of the Exchange Act solely against the Individual Defendants. *See In re MicroStrategy*, 148 F.Supp.2d at 660–61, 668–69.

**14.** No objections were received by the July 10, 2001 deadline for filing objections, nor have any been received since then.

**15.** The stipulation of settlement also provides for the entry of a final judgment that includes a bar order enjoining the MicroStrategy Defendants or any other person or entity from asserting claims against PwC in any court based upon or related to any of the allegations of the consolidated complaint. Specifically, the bar order is described in the stipulation as follows:

It is further ORDERED that any person or entity be, and the same [is], PERMANENTLY BARRED AND ENJOINED from asserting in this Court, or in any other federal court, or in any state court or other forum, any action or claim arising out of, based upon or related to any of the allegations in the Complaint or any other pleadings filed in the Action, or any claim for contribution or equitable indemnity, by which such per-

the notice sent to the class and subclass comports with the requirements of due process.

## II.

▮▮▮ The legal principles applicable to the approval of this settlement have been fully discussed in the Memorandum Opinion approving the MicroStrategy settlement. *See In re MicroStrategy*, 148 F.Supp.2d at 663–66. Simply put, the Court must assess whether the settlement here is both fair and adequate under the circumstances. *See Evans v. Jeff D.*, 475 U.S. 717, 742, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986); *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158–59 (4th Cir.1991). In doing so, the Court must consider the fairness of the settlement given "(1) the posture of the case at the time the settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of securities class action litigation," and the settlement's reasonableness given

> (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

son or entity attempts to recover losses arising out of claims made by Lead Plaintiffs or any Class Member (excluding any person or entities who timely and properly excluded themselves from the Class and Settlement Subclass), against PwC or the Released Parties.

16. *In re MicroStrategy*, 148 F.Supp.2d at 665; *see In re MicroStrategy*, 110 F.Supp.2d at 440.

*Jiffy Lube*, 927 F.2d at 159. These principles, applied here, compel the conclusion that the PwC Settlement, like the MicroStrategy Settlement, merits approval as fair and adequate. Indeed, the circumstances surrounding plaintiffs' settlement with PwC provide a compelling case for approval.

### A. *Fairness*

▮▮ As to fairness, it is important to note, as the Court earlier observed, that "counsel for both sides are nationally recognized members of the securities litigation bar." [16] Clearly, the conduct of all counsel in this case and the result they have achieved for all of the parties confirms that they deserve the national recognition they enjoy. It is also clear that the PwC Settlement, like the MicroStrategy Settlement, resulted from extensive and intensive arm's-length negotiations that were conducted in good faith and without collusion, as evidenced by counsel's efforts through mediation and less-formal negotiations. Accordingly, it is "appropriate ... to give significant weight to the judgment of class counsel that the proposed settlement is in the interest of their clients and the class as a whole." [17]

But the factor that distinguishes this settlement from the MicroStrategy Settlement—and more strongly compels a finding of fairness in this case—is the fact that plaintiffs' case against PwC was far more advanced by the time this settlement was reached than was plaintiffs' case against

17. *South Carolina Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C.1991); *see also Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977); *American Canoe Ass'n v. EPA*, 54 F.Supp.2d 621, 625 (E.D.Va.1999).

the MicroStrategy Defendants. Indeed, the PwC Settlement was reached practically on the eve of trial and after (i) plaintiffs had completed discovery, which included reviewing hundreds of thousands of pages of documents and taking and/or defending 34 depositions, which provided them with a detailed picture of the strengths and weaknesses of the case; (ii) cross-motions for summary judgment had been filed and argued; and (iii) the parties were well into their trial preparations, having exchanged exhibit lists, witness designations, and deposition designations. In this regard, it is clear that the stage of litigation at which the PwC Settlement was reached supports a finding of fairness, and that the totality of the circumstances warrant a finding that the PwC Settlement is fair.[18]

### B. Adequacy

■ It is also clear that an examination of the circumstances point persuasively to the conclusion that the PwC Settlement should be approved as adequate. As an initial matter, there is every reason to believe that continued litigation of plaintiffs' claims against PwC would have been as protracted and costly—if not more so—than continued litigation of plaintiffs' claims against the MicroStrategy Defendants. See In re MicroStrategy, 148 F.Supp.2d at 667. Also likely is that post-

trial motions and appeals would have extended the litigation and delayed any relief for plaintiffs significantly. See id.; In re Baldwin–United Corp., 607 F.Supp. 1312, 1320 (S.D.N.Y.1985). Thus, as with the MicroStrategy Settlement, the old adage, "a bird in the hand is worth two in the bush," applies with particular force here.[19]

A review of the parties' positions on the merits also favors the settlement reached. While plaintiffs believe, based on their investigation and discovery, that their claims against PwC have considerable merit and that they would prevail in a trial against PwC, no clear-eyed objective observer could fail to see that the path to victory for plaintiffs was anything but straight, smooth, or certain. As an initial matter, plaintiffs, by not compromising their claims pursuant to a fair and reasonable settlement, risked an adverse ruling on PwC's motion for summary judgment, which sought to narrow the class to only those persons who engaged in transactions involving MicroStrategy securities between March 6, 2000 and March 20, 2000, and/or PwC's motion to decertify the class. Such adverse rulings certainly would have dealt a severe blow to plaintiffs' case and likely narrowed the class significantly. It is also far from certain whether plaintiffs

---

18. See South Carolina Nat'l Bank, 139 F.R.D. at 339; Strang v. JHM Mortgage Sec. Ltd. Partnership, 890 F.Supp. 499, 501 (E.D.Va. 1995); Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 855 F.Supp. 825, 830 (E.D.N.C.1994). It should also be noted that the cash-only character of the PwC Settlement consideration does not raise the concerns associated with the securities-only character of the MicroStrategy Settlement Consideration. See In re MicroStrategy, 148 F.Supp.2d at 662–63.

19. See In re MicroStrategy, 148 F.Supp.2d at 667. In this regard, it is worth noting that the

$55 million to be recovered by plaintiffs under the PwC Settlement, either alone or combined with the amount recovered under the MicroStrategy Settlement, compares favorably to amounts recovered in similar cases. See id. at 667 n. 22 (collecting cases). Thus, the PwC Settlement provides real value to the class in exchange for the settlement of its claims against PwC, and a $55 million recovery now is worth far more than a potentially larger recovery that must be significantly discounted by the substantial risks involved in continued litigation of plaintiffs' claims.

would have met their heavy burden of proving all elements of their Section 10(b) claim—namely, that (i) PwC made a false statement or omission of material fact; (ii) with scienter; (iii) upon which plaintiffs justifiably relied; and (iv) that proximately caused plaintiffs' damages. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 387–91, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *In re MicroStrategy*, 115 F.Supp.2d at 628. With respect to scienter, especially, plaintiffs would have confronted significant burdens in proving that PwC knew or, at the very least, recklessly disregarded that MicroStrategy's financial statements in 1998 and 1999 were materially false and misleading and did not comply with GAAP. In this regard, PwC likely would have argued: (i) that under GAAS, auditing is a matter of judgment, and any mistakes PwC may have made were mistakes of judgment based on facts known at the time; (ii) that the transactions PwC audited were extremely complex; (iii) that PwC was misled by MicroStrategy's management; and (iv) that PwC was not responsible for MicroStrategy's quarterly financial statements because it did not audit them.[20] Added to plaintiffs' heavy burden at trial, moreover, would have been the daunting task of demonstrating the amount of damages suffered by the class. In this respect, the damages issue would very likely have become "a battle of experts at trial, with no guarantee of the outcome in the eyes of the jury."[21] Finally, even were plaintiffs to prevail on liability and damages issues, such a victory potentially would have been pyrrhic, as (i) there was a substantial risk that any dollar amount awarded plaintiffs by the jury would have been reduced significantly under the PSLRA's proportionate liability scheme, as PwC likely would have shifted as much blame as possible to the Individual Defendants;[22] and (ii) any money award would have been reduced by the value of the MicroStrategy Settlement pursuant to the PSLRA's terms, so that plaintiffs would have had to persuade the jury that their aggregate damages were in excess of approximately $100 million before they could recover any money from PwC. These risks further support the adequacy of the PwC Settlement.

■ Finally, it is quite significant here, as it was with the MicroStrategy Settlement, that although notice of the proposed

---

20. PwC was prepared to present at trial the testimony of auditing and accounting experts, who would have testified that, *inter alia*, PwC technically did not provide quarterly audit services to MicroStrategy; PwC did nothing inappropriate with respect to revenue recognition; recklessness cannot be inferred from PwC's exercise of its judgment; PwC was justified in relying on MicroStrategy management's representations concerning the nature of the complex transactions in which the company was engaged; and MicroStrategy senior management consciously hid information from PwC.

21. *In re Ames Dep't Stores Inc. Debenture Litig.*, 150 F.R.D. 46, 54 (S.D.N.Y.1993). Indeed, the intensity of this battle was already evident by the time the parties reached the PwC Settlement. On the one hand, plaintiffs' expert estimated a maximum damages amount of $678 million if plaintiffs prevailed on PwC's motion for summary judgment and of $461 million if plaintiffs had not. On the other hand, PwC's expert estimated a maximum damages amount of $142 million, on the grounds that inflation in MicroStrategy's stock price during the class period was caused, in large part, by factors other than the alleged misrepresentations.

22. *See* 15 U.S.C. § 78u–4(f). Under Section 78u–4(f), a covered person against whom a final judgment is entered is only jointly and severally liable if the covered person is shown to have *knowingly* committed a violation of the securities laws. Were plaintiffs unable to show PwC's actual knowledge, PwC would have been "liable solely for the portion of the judgment that corresponds to the percentage of responsibility." *Id.*

settlement was sent to more than 69,000 members of the class, no class member filed an objection. Moreover, no class members other than the seven who originally opted-out of the MicroStrategy Settlement opted-out here.[23] Because "the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy," the lack here of any objections and the small number of class members choosing to opt-out of the case, as with the MicroStrategy Settlement, strongly compel a finding of adequacy. *Sala v. National R.R. Passenger Corp.*, 721 F.Supp. 80, 83 (E.D.Pa. 1989); *see also Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir.1975) ( "The attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.").

## III.

### A. The Plan of Allocation

■ No extended discussion of the PwC Settlement's plan of allocation is necessary here, for its terms are identical in all relevant respects to the plan of allocation approved as fair and reasonable in the MicroStrategy Settlement.[24] The PwC Settlement's plan of allocation, as does the MicroStrategy Settlement's plan of allocation, fairly and rationally allocates the settlement consideration among class members and accordingly should be approved as fair and reasonable. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284–85 (9th Cir.1992); *Rubenstein v. Republic Nat'l Life Ins. Co.*, 74 F.R.D.

337, 349 (N.D.Tex.1976); *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D.Cal. June 18, 1994).

### B. The Bar Order

■ The PSLRA has clearly eliminated all claims for contribution brought against any settling defendant. To that end, it provides for the entry of a "settlement bar order," discharging all of the settling defendant's obligations to any non-settling person or party "arising out of the action." 15 U.S.C. § 78u–4(f)(7)(A); *see Neuberger v. Shapiro*, 110 F.Supp.2d 373, 381 (E.D.Pa.2000). In this regard, and because as a practical matter, "settlement often may be impossible without an effective and comprehensive Bar Order," the stipulation of settlement's bar order provision should be approved. *U.S. Fid. & Guar. Co. v. Patriot's Point Dev. Auth.*, 788 F.Supp. 880, 882 (D.S.C.1992).

### C. The Notice of Settlement

■ Finally, it is also clear that the mail and publication notice program undertaken in this case was "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort," *Eisen v. Carlisle & Jacquelin* 417 U.S. 156, 175, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), and that the content of the notice sent was sufficient to "apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them," *Maher*

---

23. The notice sent here advised class members that if they were among those who had previously excluded themselves from the MicroStrategy Settlement, they would also be excluded from the PwC Settlement.

24. *See In re MicroStrategy*, 148 F.Supp.2d at 660–61, 668–69. The only difference between

the respective plans of allocation of this settlement and the MicroStrategy Settlement is that the PwC Settlement's plan of allocation does not provide for an adjustment for members of the subclass, who state no claim under Section 20A of the Exchange Act against PwC.

*v. Zapata Corp.*, 714 F.2d 436, 451 (5th Cir.1983).

## IV.

For the foregoing reasons: (1) the partial settlement and the plan of allocation of the PwC Settlement are fair, adequate, and reasonable, meet the requirements of Rule 23, and thus merit approval; and (2) the bar order of the partial settlement should be approved.[25]

An appropriate Order has issued.

---

**25.** The only remaining issues relating to the MicroStrategy and PwC Settlements are plaintiffs' petitions for the award of attorneys' fees and costs, which are under advisement and will be disposed of in a separate Order.